IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAROD CAGER, | ) | |
| | ) | |
| *Petitioner* | ) | No. 2:22-cv-00316 |
| | ) | |
| v. | ) | |
| | ) | District Judge W. Scott Hardy |
| JOHN RIVELLO, THE ATTORNEY | ) | Magistrate Judge Lisa Pupo Lenihan |
| GENERAL OF THE STATE OF | ) | |
| PENNSYLVANIA and DISTRICT | ) | |
| ATTORNEY OF ALLEGHENY | ) | |
| COUNTY, | ) | |
| | ) | |
| *Respondents*. | ) | |

**MEMORANDUM ORDER**

For the following reasons, Petitioner's "Motion for Leave to Conduct Discovery Pursuant to Habeas Corpus Rule 6(a) and Motion to Appoint Counsel" (ECF No. 27) will be denied.

**A. Factual Background and Procedural History**

The facts underlying Petitioner's conviction, as related by the Pennsylvania Superior Court, are as follows:

> On August 14, 2011, Kiona Sirmons was at the home of relatives on Rochelle Street in Pittsburgh, Pennsylvania. She was joined by several friends, including Ravin Reid, Montaja Littlejohn, and Valon Pennix. Sometime later, Sirmons' boyfriend, Antwan Leake, and Jacelyn Terry joined the gathering. Upon arrival, Terry remained in the living room with the other women but Leake went into the kitchen. According to Detectives James McGee, Sirmons stated in an interview on September 2, 2011 that two black males entered the residence and proceeded to the kitchen approximately 15 minutes after Leake arrived. After two or three minutes, Sirmons heard multiple gunshots and saw [Petitioner] and Terrel Noaks run from the kitchen and exit the front door. In a recorded statement given to the police on September 9, 2011, which the Commonwealth published to the jury, Sirmons confirmed that she saw [Petitioner] and Noaks exit the home shortly after the shooting. Sirmons also identified [Petitioner] and Noaks in a photographic array.

> At trial, none of the women present at the Rochelle Street residence recalled details of the shooting on August 14, 2011, including the identities of any males who entered or left the house other than Leake. Sirmons testified that she previously identified [Petitioner] and Noaks as the shooters because detectives harassed her and visited her at work. She also testified that the police told her who to circle on the photographic array and she denied telling police nicknames used by [Petitioner] and Noaks.
>
> Leake died after sustaining four gunshot wounds during the August 14 attack. Of these, wounds inflicted on Leake's head and chest were deemed capable of causing death. A ballistics expert called by the Commonwealth testified that five shell casings recovered from the crime scene were .40 caliber Smith and Wesson casings fired from a Glock handgun. These casings matched the .40 caliber bullet fragments recovered from the fatal wounds inflicted upon Leake. The Commonwealth also called Tanner Shawl as a witness against [Petitioner]. Shawl testified that in December 2010, approximately eight months prior to the murder, he purchased a .40 caliber Glock handgun on behalf of [Petitioner]. Shawl further testified that [Petitioner] selected the gun and supplied funds to purchase the firearm.
>
> Lastly, the Commonwealth introduced testimony from a witness trained in the field of cellular telephone data analysis. This testimony established that [Petitioner] received four calls from Leake on the day of Leake's murder. In addition, Noaks telephoned [Petitioner] five times on the date of the crime. Four calls from [Petitioner]'s telephone on August 14, 2011 between 6:00 p.m. and 8:00 p.m. utilized a cellular tower situated in the same general area as the crime scene and [Petitioner]'s mother's residence.

Commonwealth v. Cager, No. 1994 WDA 2014, 2017 WL 3669503, at *1-2 (Pa. Super. 2017) (footnotes omitted).

Following a jury trial, Petitioner was convicted of first-degree murder and carrying a firearm without a license. He was acquitted of criminal conspiracy. On June 16, 2014, Petitioner was sentenced to a mandatory sentence of life without parole for his murder conviction and a concurrent term of 40 to 80 months' incarceration for carrying a firearm without a license. Post-sentence motions were denied on October 30, 2014. The Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence on August 25, 2017. The Supreme Court of Pennsylvania denied Petitioner's petition for allowance of appeal on February 21, 2018.

2

Petitioner filed a petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA") on November 29, 2018.  Counsel was appointed who, on March 18, 2019, filed an amended PCRA petition on Petitioner's behalf.  An evidentiary hearing was held on September 5-6, 2019.  Another evidentiary hearing was subsequently held on October 30, 2019.  The PCRA court ultimately dismissed the petition on January 7, 2020, and the Superior Court affirmed the dismissal of the petition on March 19, 2021.  The Pennsylvania Supreme Court denied Petitioner's petition for allowance of appeal on September 8, 2021.  Petitioner initiated these habeas proceeding on February 18, 2022.

### B. Legal Standard for Obtaining Discovery in a Federal Habeas Case

Rule 6 of the Rules Governing Section 2254 Cases provides that a judge may, "for good cause," authorize a habeas petitioner to conduct discovery.  See 28 U.S.C. § 2254, Rule 6(a).[1]  Good cause exists when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed be able to demonstrate that he is . . . entitled to relief."  See Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)); *see also* Han Tak Lee v. Glunt, 667 F.3d 397, 404 (3d Cir. 2012) (citing Williams v. Beard, 637 F.3d 195, 209 (3d Cir. 2011)).  Rule 6(a) strikes a balance:  it does not permit "fishing expedition[s]," *see* Williams, 637 F.3d at 210-11 (citation omitted), but it also does not require a petitioner to prove that "the additional discovery would *definitely* lead to relief," *see* Randolph v. Beard, No. 06-CV-901, 2014 WL 6065887, at *3 (M.D. Pa. Nov. 13, 2014) (quoting Payne v. Bell, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000)) (emphasis added).

---

[1] Rule 6(a) adopts the discovery devices available under Rule 26 through Rule 27 of the Federal Rules of Civil Procedure.  *See* 28 U.S.C. § 2254, Rule 6(a), see also id., advisory committee's note to 1976 adoption.  Those devices include, inter alia, depositions; requests for production of documents, other physical material, and electronically stored information; physical and mental examination; and written interrogatories.  *See generally*, Fed. R. Civ. P. 27-37.

The "burden rests upon the petitioner to demonstrate that the sought-after information is pertinent and that there is good cause for its production." Williams, 637 F.3d at 209. "[B]ald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or to require an evidentiary hearing." Zettlemoyer v. Fulcomer, 923 F.2d 284, 301 (3d Cir. 1991).

### C. The Discovery Requests

The specific discovery requested by Petitioner in his motion is set forth in a somewhat confusing and disjointed manner. For the sake of judicial economy, the Court will consolidate and address the requests in the following order.

1. **The entire police investigative and prosecutorial files relating to the murder of Antwan Leake, including anything connecting Leake's murder to that of Jason Daniels, who was shot and killed the day after Leake, as well as the entire police investigative and prosecutorial files relating to the murder of Daniels and Clayton McCray, who was shot alongside Daniels but survived.**

Petitioner, through counsel, filed numerous motions for discovery both before and after his trial seeking information regarding the unsolved homicide of Jason Daniels. It was defense counsel's initial defense theory that Daniels killed Leake and that Daniels was subsequently killed the following day in retaliation for killing Leake. In a motion to compel discovery that was filed on January 30, 2013, the defense sought police reports regarding the investigation of Daniels after counsel learned that Daniels and Leake were involved in a disagreement prior their deaths. (Exh. 16, ECF No. 15-1, pp.112-13.) A hearing was conducted on the motion, and because the Commonwealth believed that the information regarding the investigation of Daniels' death might compromise an ongoing investigation, it was agreed that the Commonwealth would collect what information was available and have the court review the information *in camera*. (Exh. 18, ECF No. 15-1, p.122.) On June 6, 2013, the defense filed another motion to compel

discovery requesting the court to conduct the *in camera* hearing so that any information that would be exculpatory to the Petitioner could be turned over to the defense. (Exh. 22, ECF No. 15-1, pp.142-43.) Although no written order appears in the record before this Court, Judge Rangos denied the defense's discovery request of the Daniels investigative homicide file. At a later hearing held on September 5-6, 2019, Judge Rangos stated that she remembered that the court conducted the *in camera* review and did not find anything exculpatory or relevant to Petitioner. She also remembered finding that the preservation of the integrity of the ongoing homicide investigation outweighed any potential value of providing the file to the defense. (Exh. 62, ECF No. 15-1, pp.786-87.)

In his direct appeal, Petitioner raised a claim of trial court error in denying the defense's request for information regarding the death of Daniels. With regard to this claim, the trial court found as follows:

> This Court held an *in camera* review of the Daniels homicide police investigatory file and interviewed the Detectives investigating the Daniels case before denying [the defense's] motion. Detectives Pugh and Boose stated *in camera* that [Petitioner] and Noaks [his co-defendant] killed Leake over drugs that Leake stole from Noaks that belonged to [Petitioner]. Two of the five young women present at the time of Leake's shooting were interviewed and identified [Petitioner] and Noaks. Despite witness reluctance to cooperate (as subsequently observed by this Court during trial where significant efforts were made to intimidate witnesses who were called to testify), the witness identifications of [Petitioner] and Noaks were solid, had been made by two people present at the scene, at least one of whom had known both men most of her life, and included knowledge of their nicknames and descriptions of each as young African-American men. Both ballistic evidence and cell phone records supported the eyewitness identifications of the two men charged in this case. In contrast, the Daniels investigation uncovered a single suspect who was described as a white, Italian or Hispanic male wearing camouflage clothing. The physical description matched a suspect named Rashad Watson, whom the police interviewed but who was at large at the time. This Court did not find evidence in the ongoing investigation that the potential of compromising that ongoing investigation by disclosing police sources was significant. As such, this Court properly denied the Motion.

5

(Exh. 35, ECF No. 15-1, pp.214-15) (footnote omitted).

Petitioner continued to seek information related to the Daniels homicide following his conviction. Specifically, in the amended PCRA petition, Petitioner's counsel made a request for discovery of any relevant Brady[2] evidence regarding the Daniels homicide, including whether the homicide had been fully investigated and resolved and whether or not police had any additional witnesses. (Exh. 44, ECF No. 15-1, p.463); (Exh. 50, ECF No. 15-1, pp.642-43.) Acting as the PCRA court, Judge Rangos ordered the Commonwealth to provide the requested discovery items in its possession for another *in camera* review. (Exh. 56, ECF No. 15-1, p.675.) Afterwards, Judge Rangos found that there was no information relevant to Petitioner's claim in the reviewed materials and ruled that the Commonwealth did not have to provide any of the materials to Petitioner since they related to an ongoing investigation. (Exh. 57, ECF No. 15-1, p.676.)

Now in federal court, Petitioner is again seeking the same information that he was twice denied access to in state court following Judge Rangos' *in camera* reviews of the Daniels homicide file. Petitioner maintains that the file contains exculpatory information which would prove that it was Daniels who in fact killed Leake. His theory is that Rashad Watson, the sole suspect in the Daniels case, had a "brotherly like" relationship with Leake and that Watson killed Daniels in retaliation for Daniels killing Leake. *See*, *generally*, ECF No. 27. Petitioner, however, ignores the fact that two *in camera* reviews of the Daniels homicide file by the state court revealed no exculpatory or relevant information to Petitioner's case. His request is based on mere speculation that exculpatory information is contained within the file despite the state

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

6

court finding that none existed and is the textbook example of the type of "fishing expeditions" that are not permitted in a federal habeas case. For these reasons, this request is denied.

Additionally, Petitioner's request for his entire investigatory file is overly broad and not proportional. His theory that the file may contain information regarding possible alternative suspects to Leakes' murder is based on speculation and the hope of finding favorable evidence. Bald and general allegations that the requested documents might contain something of benefit to Petitioner is insufficient to justify discovery. For this reason, this request is also denied.

2. **<u>Any and all police reports, interviews, complaints, or other documents pertaining to a shooting in the South Side of Pittsburgh on July 31, 2011.</u>**

According to the record, a shooting incident took place on July 31, 2011, approximately one week before Leake's death. There were no human victims associated with this shooting (cars and homes were shot). There were witness statements taken, but police were never able to identify anyone involved with that shooting and no one was ever charged. All of the information police had regarding that shooting was provided to the defense before trial because the guns used in that shooting were possibly connected to the Leake homicide. Debra Tator, a scientist with the Allegheny County Medical Examiner's Office Forensic Laboratory Division in the firearms and tool marks section, testified at Petitioner's trial that the gun found in Leake's waistband after he was killed (a .40 caliber Smith & Wesson), and the gun used to kill Leake on August 14, 2011, could have potentially been used at the shooting on July 31, 2011. (JT2 at 301-02, 313-19.)

While information from the police investigation was introduced at trial to show that Leake may have been involved in the shooting that occurred on July 31, 2011, there was no evidence that Daniels was also present on July 31, 2011. Defense counsel did, however, argue

that the involvement of Leake's gun in other incidents around town showed that he had many enemies who may have had motive to kill him. During closings, he argued as follows:

> Now, remember we had some more scientists come up and talk to you . . . [T]here is a question about who did this, that is what the question is. Do you remember that? Was it a .38? I can't remember the caliber of the gun tucked in Antwan's waistband when they found him. Do you remember the young lady that came in and testified about that? In July, the month before, and June 2nd the month before, that gun is around the South Hills section of Pittsburgh in other incidents and assaults shooting at people. Antwan Leake was not a man without enemies.
>
> What is Jarod Cager? What evidence do you have about Jarod Cager's position in Antwan Leake's life? What you heard was that they are friends. They have been friends. You heard no evidence, and I would agree and Mr. Fitzsimmons will tell you and I will right now, the Commonwealth doesn't have to prove motive to prove someone guilty of a crime. You think about this as far as a motive, all of those other criminal incidents that Antwan's gun is going around used in. So you got the case that somebody is identified as a friend that has a motive to do anything like this? I submit to you that is not Jarod Cager in this matter.

(JT2 at 535-36.)

Information placing Daniels at the shooting on July 31, 2011 was not available until McCray wrote a letter to Petitioner's PCRA attorney nearly five-and-a-half years after trial. According to the letter, McCray witnessed Leake shoot at Daniels multiple times on July 31, 2011. This was discussed at length by the parties at the PCRA hearing held on September 5-6, 2019. During that hearing, Judge Rangos found that McCray's alleged first-hand knowledge placing Daniels and Leake at the July 31, 2011 shooting would have been deemed inadmissible at trial because it was irrelevant and unreliable for the following reasons:

> [M]y point is that if McCray is not a reliable source, and at this juncture, everything I have read about him would lean towards he's not a credible source, the fact that he's aware of that [July 31, 2011] shooting earlier could be from any number of reasons.

\* \* \* \*

>   It's going the admissibility of the second part that I just learned of. That is the information McCray writes in his letter of 2019 to you connecting a second shooting July 31st involving Daniels, according to him.
>
>   Where he and Daniels are, again, together. Leake is also present and there's an exchange of gunfire. But the only evidence of that is the testimony of your client, who has knowledge five and a half years later that the gun on the body was a match to one of the guns used in that shooting in the evening. But one of the guns used to kill Leake was also likely a match.
>
>   And that's the one that has been tied to Cager through the testimony of witnesses at trial and also the testimony of the gun owner who - - or the purchaser of the gun who testified that he bought it for Cager.
>
>   * * * *
>
>   But, again, had Mr. McCray provided that information to the police or somebody before trial as opposed to five and a half years later after everybody has scrubbed the transcripts repeatedly, that may have been something Ms. Shebs would have considered using.
>
>   However, the fact that he did not provide that information to her, the fact that we know these guns are passed around within the drug communities, so the gun that Mr. Leake had on his person may or may not have been in Mr. Leaks' possession on July 31st.
>
>   And there's nothing to corroborate Mr. McCray's now story that Mr. Leake was present July 31st and that he and Mr. Daniels were present on July 31st at the unsolved shooting of homes and cars.
>
>   The fact he had the gun later in Mr. Leaks' possession was tied to that did come into trial. But there is nothing to corroborate that Daniels and McCray were also present at that scene except Mr. McCray's five and a half year later story with the benefit of hindsight and the transcript.
>
>   So I don't think that's any more credible than his story regarding the retaliatory shooting of Daniel and Leake the next day.

(Exh. 62, ECF No. 15-1 at 118, 140-41.)

According to the record, the information Petitioner seeks regarding the shooting on July 31, 2011 was already turned over to the defense before trial, and, while that information did show that the weapon found on Leake after he died may have been used at the shooting on July

9

31, 2011, there was no evidence gathered from that police investigation to suggest that Leake or Daniels was present at that shooting. Therefore, this discovery would not demonstrate that Petitioner is entitled to relief on what the Court would assume would be Claim 6 in his habeas petition, a claim of ineffective assistance of counsel for failing to present evidence that Daniels had motive to kill Leake as indicated by the shooting between the two on July 31, 2011. Nevertheless, even if evidence did exist that showed Daniels and Leake were involved in the shooting on July 31, 2011, such evidence would have only shown that other individuals may have had motive to kill Leake, a theory that was actually advanced and argued by the defense at trial as suggested by the evidence showing that Leake's weapon (the weapon found on his body) was involved in other shootings around town.

The requested information would not demonstrate that Petitioner is entitled to relief on his claims, and thus Petitioner has not shown good cause for its production. This request is therefore denied.

3. **All personnel files and internal affairs records regarding allegations of abuse of power and misconduct by all police, detectives and prosecutors involved in the investigation and prosecution of Petitioner, including those of officers Clifton Pugh, Vonzale Boose and James McGee.**

Petitioner does not state what he believes this information would reveal, but the request is nevertheless denied because it is overly broad and not proportional, irrelevant to Petitioner's habeas claims and it also amounts to an impermissible fishing expedition.

4. **Judicial misconduct reports against Judge Rangos.**

Petitioner does not state what he believes this information would reveal, but this request is denied because the information sought is not relevant to Petitioner's habeas claims and he has therefore failed to show good cause for its production.

10

5. **Any and all records, affidavits and warrants ever issued by Judge Rangos against Jason Daniels and Clayton McCray.**

Petitioner asserts that this would lead to the discovery of information demonstrating Judge Rangos' "bias and partiality," for example when she ruled that McCray's proposed testimony at Petitioner's PCRA hearing was inadmissible as it pertained to his drug activities with Daniels, as well as Daniels' alleged confession to murdering Leake. Petitioner appears to argue that Judge Rangos' rulings in his case were based on external information that she had learned about Daniels and Leake, particularly their drug dealing activity, when signing warrants. This request is denied because the information sought is not relevant to Petitioner's habeas claims and therefore he has failed to show good cause for its production.

D. **Motion to Appoint Counsel**

Petitioner's motion also contains a request for the appointment of counsel. Petitioner, however, has no constitutional right to counsel in this habeas proceeding, Pennsylvania v. Finley, 481 U.S. 551, 555 (1987), and because this is a noncapital case, he has no statutory right to counsel either. It is within the Court's discretion to appoint a financially eligible habeas petitioner counsel if it determines that the interests of justice so require. 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B); Section IV.A.2.b of the *Criminal Justice Act Plan of the United States District Court for the Western District of Pennsylvania*. Under Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the Court must appoint counsel to represent a financially eligible petitioner if it authorizes discovery *and* determines that appointment is "necessary for effective discovery[.]" Under Rule 8(c), the Court must appoint counsel to represent a financially eligible petitioner if it determines that "an evidentiary hearing is warranted[.]"

11

The Court has determined that there are no grounds to support the appointment of counsel at this time. In the event the Court subsequently determines that this case is one in which it should exercise its discretion and appoint Petitioner counsel, or is one in which it must appoint counsel for him, the Court will do so in accordance with its Criminal Justice Act Plan.

## **ORDER**

**AND NOW**, this 15th day of September, 2023, Petitioner's "Motion for Leave to Conduct Discovery Pursuant to Habeas Corpus Rule 6(a) and Motion to Appoint Counsel" (ECF No. 27) is **DENIED**.

                                                                Lisa Pupo Lenihan
                                                                United States Magistrate Judge

Cc:    Jarod Cager
          LQ3327
          SCI Huntingdon
          1100 Pike Street
          Huntingdon, PA  16652

          Counsel for Respondents
          (Via CM/ECF electronic mail)